IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRIGETT McGUIRE, | ) | CASE NO. 1:11-cv-1097 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN A. POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J.ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Brigett McGuire ("Plaintiff" or "McGuire") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a

Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the decision of the Commissioner should be AFFIRMED.

## I.  Procedural History

McGuire filed her application for Disability Insurance Benefits on July 31, 2006.[1]  Tr. 33.

She alleged a disability onset date of February 1, 2006.  Tr. 83.  She based her claim of disability

on manic depression and back problems.  Tr. 57.  After initial denials by the state agency (Tr.57-

61, 65-71), McGuire requested a hearing (Tr. 72), and Administrative Law Judge Peter Beekman

(the "ALJ") held an administrative hearing on December 7, 2009.  Tr. 8-32.

---

[1] The transcript contains inconsistent application filing dates.  The "Disability Determination and Transmittal"
reflects a July 31, 2006, filing date (Tr. 33), whereas, the "Application Summary for Disability Insurance Benefits"
references an August 1, 2006, date.  Tr. 83.  The parties' briefs set forth different application filing dates, i.e.,
Plaintiff asserts that the application was filed on July 31, 2006 ( Doc. 19, p. 1) while Defendant asserts that the
application was filed in August 2006 (Doc. 21, p. 1).  Since the actual filing date is not at issue, the filing date as
determined by the ALJ, i.e., July 31, 2006, is accepted.

1

In his February 19, 2010, decision (Tr. 36-56) the ALJ determined that McGuire had not been under a disability from February 1, 2006, through December 31, 2009, her date last insured. Tr. 48.  McGuire requested review of the ALJ's decision by the Appeals Council on April 6, 2010.  Tr. 6-7.  On March 23, 2010, the Appeals Council denied McGuire's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

McGuire was thirty-four at the time of the hearing and was married with three children ages four, six and eight, one of whom is autistic.  Tr. 11-12, 15, 666.  She has a high school education.  Tr. 11.  She has past work as an animal shelter manager and veterinarian assistant. Tr. 11.

### B.  Medical Evidence

#### 1.      Treating physicians

##### a.  Doug McLaughlin, D.O. – treating psychiatrist

Dr. McLaughlin treated McGuire from 2004 through at least 2009 for her mental health issues.  Tr. 216-242, 534-569, 739-750, 843-853, 859-861, 882.  His diagnoses included bipolar II disorder (principal), obsessive compulsive disorder, with poor insight (provisional), and generalized anxiety disorder (provisional).  Tr. 216, 537-541, 883.  On December 3, 2009, Dr. McLaughlin completed an "Assessment Of Ability To Do Work-Related Activities (Mental)" wherein he offered his opinion as to how McGuire's mental limitations would impact her ability to stay on task during an 8 hour work day.[2]  Tr. 882-883.  Of the fifteen areas that Dr.

---

[2] The rating scale was: **None** – absent from limitation (i.e., on task 100% in an 8 hour work day); **Mild** – slight limitation but can generally function well (i.e., on task 88%-100% in an 8 hour work day); **Moderate** – significant limitation (i.e., on task 82% - 88% in an 8 hour work day); **Marked** – serious limitation, severely limits ability to

McLaughlin rated, he found McGuire to be extremely impaired in three;[3] markedly impaired in four;[4] moderately impaired in six;[5] and mildly impaired in two.[6]  Tr. 882-883.  He opined that it was likely that McGuire's condition would deteriorate if she was placed under stress, especially stress of a job, and he also opined that McGuire would be absent from work about twice each month as a result of her impairments.  Tr. 883.

**Teresa D. Ruch, M.D. – neurologist**

On May 3, 2007, Dr. Teresa D. Ruch performed back surgery.  Tr. 507.  McGuire had an L4-L5 laminectomy, foraminoctomies and bilateral/lateral fusion including placement of pedicle screws.  Tr.  507.  In her first postoperative visit on June 11, 2007, McGuire reported feeling better than before surgery; her right leg pain was completely gone but she had some burning in her low back and some pain in the left groin and left anterior thigh.  Tr. 506.  A June 29, 2007, an x-ray report revealed "vertebral bodies are normal in height and alignment" and "[n]o fracture or bone lesion is identified."  Tr. 462.  On July 2, 2007, Dr. Ruch indicated that "[p]lain lumbar spine films show screws and rods in good position and alignment" and "adequate bone graft in the bilateral/lateral gutters."  Tr. 505.  However, on August 20, 2007, Dr. Ruch noted that it was possible that a screw had entered the disc space but it was hard to tell from the x-rays and she

---

function (i.e., on task 48% - 82% in an 8 hour work day); and **Extreme** – major limitation with no useful ability to function (i.e., on task 0% - 48% in an 8 hour work day). Tr. 882.

[3] Ability to respond to customary work pressures; ability to respond appropriately to changes in the work setting; and ability to behave in an emotionally stable manner.  Tr. 882-883.

[4] Ability to maintain concentration and attention for extended periods; ability to sustain a routine without special supervision; ability to perform activities within a schedule, maintain regular attendance and be punctual;  and ability to perform complex, repetitive, or varied tasks.  Tr. 882-883.

[5] Ability to relate to other people; ability to engage in daily activities such as attend meetings, socialize with friends, etc.; ability to maintain personal habits; ability to respond to appropriately to co-workers; ability to use good judgment; and ability to perform simple tasks.  Tr. 882-883.

[6] Ability to understand, carry out and remember instructions and ability to appropriately respond to supervision.  Tr. 882.

ordered a repeat MRI.  Tr. 504.  On November 5, 2007, although McGuire indicated she was still experiencing pain and was continuing to receive pain management treatments from Dr. Mikhail, she informed Dr. Ruch that she was functioning better and Dr. Ruch reported that McGuire "looks like she is in absolutely no pain whatsoever."  Tr. 662.  On February 11, 2008, McGuire indicated that she experienced pain when she engaged in vigorous activity, however, she did not have pain as long as she was not doing heavy work.  Tr. 602.  Dr. Ruch noted on February 11, 2008, that the x-rays were fine.  Tr. 602.  On June 2, 2008, Dr. Ruch reviewed an MRI scan and indicated that the scan did not show any nerve root impingement.  Tr. 668.  Also, an EMG nerve conduction study showed no nerve root changes or damage.  Tr. 668.  Because of McGuire's reports of continued pain and because Dr. Ruch had no further surgical options for McGuire, Dr. Ruch recommended that she see Dr. Mikhail for a spinal cord stimulator procedure.  Tr. 668.

### b.  Emad Mikhail, M.D. – pain management physician

On March 15, 2007, an initial evaluation was conducted by Dr. Emad Mikhail at Great Lakes Pain Management. Tr. 464-467.  Dr. Mikhail treated McGuire with pain medication and epidural injections both prior to and following her back surgery and performed a spinal cord stimulator procedure.  Tr. 468-481, 485-501, 604-642, 670-719, 752-755, 874-880.  On November 26, 2008, Dr. Mikhail indicated that McGuire obtained 75% relief from the spinal cord stimulator procedure.  Tr. 874.  The relief was intermittent and at the site of the stimulation. Tr. 757, 874.  On February 23, 2009, Dr. Mikhail completed a Pain Questionnaire.  Tr. 757.  He indicated that it was his belief that McGuire was truthful regarding her perception of pain.  Tr. 757.  When asked whether "the intensity and persistence of the pain as experienced by the claimant affect[s] . . . her ability to do basic work-related activities," Dr. Mikhail opined yes, but the basis for his opinion was McGuire's own statements, i.e., "she states . . ."  Tr. 757.  In a prior

report from 2007, Dr. Mikhail indicated that someone other than him would be better able to describe any limitations that McGuire's impairments imposed on her ability to perform sustained work activity.  Tr. 484.

### c.  Susan Stephens, M.D. – treating orthopedic surgeon

In July 2009, Dr. Susan Stephens saw McGuire for a spine consultation.  Tr. 840-841. Her consult revealed that McGuire had a pedicle screw in her disc space and surgery was performed to remove the screw.  Tr. 838, 841.  On September 2, 2009, McGuire reported to Dr. Stephens that "her back feels great." Tr. 837.   Again, on October 21, 2009, McGuire reported to Dr. Stephens that "[h]er back feels much better" and the plan was to continue activities as tolerated. Tr. 836.  On January 6, 2010, Dr. Stephens completed a "Medical Statement – Physical Abilities and Limitations" and a "Pain Questionnaire."  Tr. 886-887.   On the "Medical Statement – Physical Abilities and Limitations," Dr. Stephens opined that McGuire could only lift 5 pounds occasionally and 10 pounds frequently.  Tr. 886.  Dr. Stephens also rated McGuire's ability perform various activities as either "never," "occasionally," "frequently," or "constantly."  Tr. 886.  There were no activities that McGuire could not perform; only two activities that McGuire should only perform occasionally;[7] four activities that McGuire should only perform frequently;[8] and eleven activities that McGuire could perform constantly.[9]  Tr. 886. Overall, Dr. Stephens opined that McGuire suffered from "moderate" pain; the rating choices being none-mild-moderate-severe-extreme.  Tr. 886.  Dr. Stephens did not offer an opinion as to the number of days that she anticipated McGuire would be absent from work as a result of her

---

[7] Work around dangerous equipment and tolerate heights.  Tr. 886.

[8] Bend, stoop, balance and operate a motor vehicle.  Tr. 886.

[9] Fine manipulation with right hand; fine manipulation with left hand; gross manipulation with right hand; gross manipulation with left hand; raise left arm over shoulder level; raise right arm over shoulder level; tolerate heat; tolerate cold; tolerate dust, smoke or fumes exposure; and tolerate noise exposure.  Tr. 886.

impairment. Tr. 886. Dr. Stephens indicated that she believed McGuire was truthful about her perception of pain. Tr. 887.

## 2. Consultative physicians

### a. Richard C. Halas, M.A. – clinical psychologist

On March 13, 2007, Dr. Richard C. Halas conducted a psychological evaluation to determine McGuire's then current levels of adjustment and mental status. Tr. 352-355. Dr. Halas assessed McGuire as having a GAF score of 55, indicating moderate symptoms.[10] Tr. 355. He noted that McGuire reported having few friends but a stable relationship with her husband. Tr. 355. When rating her work-related mental abilities, Dr. Halas opined that: (1) McGuire had moderate limitations in her ability to relate to others, including peers, supervisors, and the general public, with a notation that symptoms of depression and anxiety may restrict McGuire in this area; (1) McGuire was not limited in her ability to follow through with simple one and two-step instructions and/or directions; (3) McGuire was not limited in her ability to maintain attention to do simple, repetitive tasks; and (4) McGuire had marked limitations in her ability to withstand the stresses and pressures associated with most day-to-day work settings, with a notation that symptoms of depression and anxiety are likely to become exacerbated rather quickly if she is placed in a setting that is stressful, fast-paced or demanding. Tr. 355.

### b. Shu Que Huang. M.D.

In April, 2007, Dr. Shu Que Huang conducted a consultative examination. Tr. 356-358. His examination revealed that McGuire could walk easily, could walk on her tiptoes and heels,

---

[10] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*

and could squat down.  Tr. 356.  Dr. Huang noted mild limitation in her lumbar range of motion but indicated that McGuire had good functional range overall.  Tr. 356.  It was Dr. Huang's opinion that, notwithstanding McGuire's lumbar disk bulge at L4-L5 with some radicular component, clinically there was no clear weakness or other major impairment.  Tr. 358. Therefore, he concluded that McGuire should at least be able to perform light work, i.e., up to 20 pounds with intermittent position change; noting that she was able to lift her youngest child who weighed more than 30 pounds.  Tr. 358.

### 3.      State agency reviewing physicians

#### a.      Benjamin Blackman, M.D. – psychiatrist

On May 8, 2007, Dr. Benjamin Blackman completed a Psychiatric Review Technique and a Mental RFC.  Tr. 427-440.  In the Psychiatric Review Technique, he opined that there was a medically determinable impairment present, i.e., depressive disorder NOS and generalized anxiety disorder, but it did not meet the diagnostic criteria for Listing 12.04-Affective Disorders. Tr. 429-430.  Further, he opined that McGuire had moderate limitations in activities of daily living; maintaining social functioning; and maintaining concentration, persistence and pace.  Tr. 435.  He found one or two repeated episodes of decompensation, each of extended duration.  Tr. 435.

In the Mental RFC, Dr. Blackman noted only one marked limitation, i.e., ability to carry out detailed instructions.  Tr. 438.  He noted only one moderate limitation, i.e., ability to understand and remember detailed instructions.  Tr. 438.  In the remaining eighteen categories, Dr. Blackman indicated that McGuire was not significantly limited.  Tr. 438.   In summary, it was Dr. Blackman's opinion that McGuire "could do simple job tasks on a regular basis."  Tr. 440.

   b. **William Bolz, M.D.**

On September 24, 2007, Dr. William Bolz completed a Physical RFC.  Tr. 514-521.   He opined that McGuire could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about 6 hours in an 8 hour workday; sit for about 6 hours in an 8 hour workday; and push and/or pull unlimitedly except for lift and/or carry restrictions.  Tr. 515.  He also opined that she could only occasionally climb ramps, stairs, ladders, ropes, and scaffolds; balance, stoop, kneel, crouch, and crawl.  Tr. 516.  He found no manipulative, visual, communicative or environmental limitations.  Tr. 517-518.

   4. **Other physicians**

   a. **Mark A, Cohen, Psy. D. – clinical psychologist**

On August 29, 2008, when performing a psychological evaluation to determine whether McGuire was an appropriate candidate for a nerve stimulator procedure, Dr. Mark A. Cohen reviewed Dr. McLaughlin's psychiatric records for the past year and indicated that those records showed that McGuire was stable on her medication.  Tr. 666.  Dr. Cohen also indicated that McGuire reported that depression was currently not a problem for her and that her mood was stable.  Tr. 667.  Dr. Cohen indicated that she did not present as depressed or anxious at the time of the evaluation and indicated there was no evidence of any psychotic symptoms, paranoia, or delusional ideation.  Tr. 667.  He determined that she was an appropriate candidate for the nerve stimulator procedure; she was emotionally stable, compliant with her medication and did not show any significant symptoms of mental health problems.  Tr. 667.

### C. Testimonial Evidence

### 1.    McGuire's Testimony

McGuire was represented by counsel and testified at the administrative hearing.  Tr. 11-25.  She stated that her alleged disability onset date of February 1, 2006, was the date that she decided to see a spine doctor.  Tr. 11.  She started having problems following the birth of her third child in July 2005.  Tr. 11.  She was discharged from her job before that, in November, 2004.[11]  Tr. 11-12.  She testified regarding her back problems and treatment received, which included surgical intervention.  Tr. 13.  Her most recent surgery had been in August 2009.  Tr. 22.  Following that surgery, McGuire experienced a 20% lessening of her symptoms.  Tr. 22.  Her pain was primarily in her left leg, hip joint and lower back.  Tr. 23.  She also noted she has scoliosis in her upper back.  Tr. 23.  She testified that she experiences pain, numbness and tingling daily as a result of her back problems.  Tr. 23.  Her left leg is weakened.  Tr. 23.  She testified that she can lift no more than 10 pounds.  Tr. 24.

As to her mental health problems, McGuire testified that she was diagnosed in 2004 as having bipolar disorder.  Tr. 14.  She was taking at least five different medications, including Seroquel, which had most recently been prescribed.  Tr. 14.  It was her hope that the Seroquel would work because she did not feel that the other medications were working.  Tr. 14.

As to her daily living activities, she takes care of her three children with some assistance from her husband, including getting them ready for school, taking her youngest to and from school, and assisting with baths; she performs light housework; and she goes grocery shopping.  Tr. 15-16.  Approximately two days per month her husband is required to stay home from work because McGuire is not in a position, mentally, to take care of their children.  Tr. 24.  She has

---

[11] During her testimony, McGuire did not indicate which job she was discharged from in 2004 or the reason for the discharge.  However, consultative psychologist Dr. Richard Halas noted in his report that McGuire was terminated from her job at the Lake County Humane Society after nine years when a new administrator was hired.  Tr. 354.

attempted to exercise but is unable to do so. Tr. 16. She can walk about a quarter of a mile. Tr. 17. She testified that she does nothing for enjoyment. Tr. 18.

She indicated that her anti-depressant pills make her very tired and she gets dizzy and experiences tremors. Tr. 18-19. She testified that she had recently experienced a serious breakdown, which stemmed from not having slept for three days. Tr. 19-20. Following that episode, McGuire's physicians modified her medications. Tr. 20. She no longer sleeps in the same bed as her husband because it is so difficult for her to fall asleep and, if she is able to fall asleep, she is afraid that her husband's activity would wake her up. Tr. 20.

She testified that she is unable to concentrate long enough to watch a half hour television show. Tr. 21. She has crying spells every other day. Tr. 21. She said she has been diagnosed with OCD and becomes very upset if the house is not a certain way, i.e., everything has to be in its place. Tr. 21-22. She has had suicidal thoughts (Tr. 21, 25) but has never attempted to kill herself. Tr. 25.

### 2.    Medical Expert Testimony

Herschel Goren, M.D., a neurologist, testified as a medical expert at the hearing. Tr. 25-26, 76. He testified that none of McGuire's severe impairments of lumbar spine pain, depressive disorder not otherwise specified, generalized anxiety disorder, obsessive compulsive disorder ("OCD"), and substance abuse met or equaled a Listing. Tr. 25. He also provided his opinion as to McGuire's Residual Functional Capacity ("RFC"). Tr. 25-26. Specifically, Goren opined that McGuire could: lift or carry 20 pounds occasionally and 10 pounds frequently; never climb ladders, ropes or scaffolds; occasionally climb ramps or stairs; occasionally stoop, kneel, crouch or crawl; not be exposed to unprotected heights; not be subject to high production quotas, i.e., no assembly line work or work in which she would be paid in piece rate; have only

superficial interpersonal interaction with supervisors, i.e., no arbitration, negotiation, confrontation, supervision of others or responsibility for the safety and welfare of others. Tr. 25-26.  The ALJ asked Dr. Goren to reconcile his opinion that McGuire could not be responsible for the health, safety and welfare of others with the fact that she was currently raising three minor children.  Tr. 26.  Dr. Goren indicated that his testimony was based on what he saw in the record, not the testimony that McGuire provided at the hearing.  Tr. 26.

### 3.    Vocational Expert's Testimony

Vocational Expert Carla Mosley (the "VE") testified at the hearing.  Tr. 26-30.   The VE testified that McGuire's work as a veterinary assistant had been performed at the medium exertional level.  Tr. 27.  Her work as a manager at an animal shelter was performed at the medium to heavy exertional level.  Tr. 27.  Both positions were semi-skilled with no transferable skills.  Tr. 27.   The ALJ asked the VE to provide her opinion as to whether a hypothetical person as described below would be capable of performing McGuire's past work and whether there would be other jobs in significant numbers in the national and regional economy for this person.  Tr. 27-29.

> [A] female, 34 years of age, and has a high school education and the same work experience as the claimant. This hypothetical person can lift and carry 20 pounds occasionally, 10 pounds frequently; stand and walk six out of eight; can sit six out of eight; no limit on push-pull or foot pedal; occasionally use a ramp or stairs, never a ladder, rope or a scaffold; can frequently balance, occasionally stoop, kneel, crouch, and crawl; no manipulative, visual or communications deficits. This person should avoid unprotected heights.  This person can do simple and complex tasks, but they should be low-stress, no high production quotas or piece-rate work, no work involving arbitration, negotiation, or confrontation; superficial, impersonal interactions with the public, coworkers, and supervisors; no supervision; no responsibility for the health and safety and welfare of another party.

Tr. 28.  The VE testified that such a hypothetical person would be precluded from performing McGuire's past work, not only because of the exertional components of the hypothetical but also

11

because of the non-exertional components.  Tr. 28-29.  However, the VE also testified that such a hypothetical person could perform the following jobs that were at the light, unskilled level and that exist in significant numbers in the national economy: cleaner, kitchen worker, and stocker.[12] Tr. 29.

McGuire's counsel then asked the VE whether adding to the previously described hypothetical a limitation that the person would be off-task at least 18% of the day would change her opinion.  Tr. 30.  The VE testified that such a limitation would preclude employment for that individual.  Tr. 30.  McGuire's counsel also asked whether being absent from work two days per month would impact the availability of jobs to the ALJ's hypothetical individual.  Tr. 30.  The VE testified that, yes, such a limitation would also preclude employment.  Tr. 30.

### D.  Lay Evidence

McGuire's husband Kenneth J. McGuire completed a "Pain/Third Party" questionnaire on May 15, 2008 (Tr. 596-599) and McGuire's mother Betty Reploge completed a "Pain/Third Party" questionnaire on May 22, 2008. Tr. 643-645.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

[A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable

---

[12] The VE stated that she was limiting the hypothetical person to unskilled work because, although the ALJ stated that the hypothetical person could do complex tasks, he also indicated simple tasks.  Tr. 29.

to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *see also* *Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

# IV. The ALJ's Decision

In his February 19, 2010, decision, the ALJ made the following findings:

1.    McGuire meets the insured status requirements through December 31, 2009.  Tr. 41.

2.    McGuire did not engage in substantial gainful activity during the period from her alleged onset date of February 1, 2006, through her date last insured of December 31, 2009.  Tr. 41.

3.    McGuire has severe impairments of disorder of the back and an affective disorder.  Tr. 41-42.

4.    McGuire did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments.[13] Tr. 42-43.

5.    McGuire has the RFC to perform light work with certain restriction.  Tr. 43.  She can lift and carry 20 pounds occasionally and 10 pounds frequently; can lift, stand and walk up to six hours in an eight-hour day; must avoid climbing ladders, ropes and scaffolds, but can occasionally climb ramps or stairs; can balance frequently, but only occasionally stoop, kneel, crouch or crawl; is precluded from unprotected heights; can perform both simple and complex tasks that are also low stress; is precluded from work involving arbitration, confrontation or negotiation; can have minimal interaction with the public, her co-workers and supervisors; must avoid being responsible for the health, safety and welfare of others.  Tr. 43-47.

6.    Through her date last insured, McGuire was unable to perform her past relevant work of veterinary assistant and shelter manager.  Tr. 47

7.    McGuire was born on April 9, 1975, and was 34 years old, defined as a younger individual age 18-49, on the date last insured. Tr. 47.

8.    McGuire has at least a high school education and can communicate in English.  Tr. 47

9.    Transferability of job skills is not material to the determination of disability.  Tr. 47.

---

[13] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

10.     Considering McGuire's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that McGuire can perform. Tr. 47-48.

Based on the foregoing, the ALJ determined that McGuire had not been under a disability from February 1, 2006, through December 31, 2009, the date last insured.  Tr. 48.

## V. Parties' Arguments

### A.     Plaintiff's Arguments

McGuire argues that the ALJ's evaluation of the medical evidence was flawed.  Doc. 19, p. 3, 4-10.  She asserts that the ALJ failed to follow the treating physician rule and failed to state what weight was assigned to the consultative examiner's opinion.  Doc. 19, p. 3, 4-10.  McGuire also argues that the ALJ failed to consider properly the third party reports of McGuire's mother and husband regarding McGuire's pain in accordance with SSR 96-7p.  Doc. 19, p. 3, 11-12.  Finally, McGuire argues that the ALJ's credibility finding is not supported by substantial evidence.  Doc. 19, p. 3, 12-14.

### B.     Defendant's Arguments

In response, the Commissioner argues that the ALJ reasonably assessed the treating and examining sources' medical opinions.  Doc. 21, p. 6-9.  The Commissioner also contends that the ALJ did not commit reversible error in not discussing statements from McGuire's mother and husband  (Doc. 21, p. 9) and that the ALJ reasonably assessed McGuire's credibility.[14]  Doc. 21, p. 10.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's decision absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact

---

[14] The Commissioner argues that, if the Court reverses the decision, the Court should remand the case for further fact finding, rather than award benefits as requested by the Plaintiff.  Doc. 21, p. 11.

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.**     **The ALJ properly applied the treating physician rule when evaluating the medical opinions.**

Under the treating physician rule, an ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors which tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(d), 416.927(d). However, the ALJ is not obliged to explain the weight afforded to each and every factor that might pertain to the medical source opinions.  *See Francis v. Comm'r of Soc. Sec.*, 414 F. App'x. 802, 804 (6th Cir. 2011)(indicating that an exhaustive factor-by-factor analysis is not required).

Clear articulation of how the treating physician rule is applied allows a claimant to understand the rationale for the Commissioner's decision and it allows for meaningful review of the ALJ's application of the treating physician rule.  *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242-243 (6th Cir. 2007).

### 1.  Dr. McLaughlin

McGuire makes several arguments with respect to the ALJ's treatment of Dr. McLaughlin's opinion.  First, she asserts that the ALJ did not state the specific weight provided to McLaughlin's opinion.  However, the ALJ's decision and his analysis of Dr. McLaughlin's opinion allows this Court to conduct a meaningful review and to determine the weight provided to the opinion.  *Rogers*, 486 F.3d at 242-243; *see also Nelson v. Comm'r of Soc. Sec.*, 195 Fed. App'x. 462 (6th Cir. 2006)(finding that a failure to explicitly indicate the weight afforded a doctor's opinion to be harmless error where the goal of providing good reasons was met).  Further, while the ALJ did not discuss point by point each factor under 20 C.F.R. § 404.1527(d), such a detailed analysis is not required.  *Francis*, 414 F. App'x. at 804.  Moreover, a review of the ALJ's decision demonstrates that the ALJ did consider the factors set forth in 20 C.F.R. 404.1527(d) in his analysis.

With regard to the first factor, i.e., the length of the treatment relationship and the frequency of the examination, the ALJ considered the fact that the McGuire "began treating with Doug McLaughlin, D.O. in 2004 and sees him approximately once every several months."  Tr. 46.  As to the second factor, i.e., the nature and extent of the treatment relationship, the ALJ considered that McLaughlin treated McGuire with medication but not counseling sessions.  Tr. 46.  As to the third factor, i.e., supportability of the opinion, the ALJ determined that McLaughlin's opinion of "marked limitations" in certain areas was not supported by the doctor's

own treatment notes reflecting McGuire's mood as stable or by McLaughlin's fairly conservative course of treatment of McGuire over the years.  Tr. 46.   As to the fourth factor, i.e., consistency of the opinion with the record as a whole, the ALJ considered McGuire's decision on her own to discontinue certain medications while pregnant and refusing to discuss other treatment options with her treating psychiatrist as well as her lack of counseling sessions.  Tr. 46.  As to the fifth factor, i.e., specialization of the source, while not specifically addressed, the ALJ was certainly aware of Dr. McLaughlin's psychiatric specialty.  Tr. 46.  Finally, as to the sixth factor, i.e., any other factors which tend to support or contradict the opinion, the ALJ considered the fact that McGuire cares for her three children, including one who is autistic, and that having the ability to manage such care on a daily basis is both physically and emotionally demanding and reflective of limitations less restrictive than those alleged by McGuire.  Tr. 44, 46-47.  Accordingly, McGuire's claim that the ALJ did not apply or consider the requisite factors under 20 C.F.R. § 404.1527(d) when considering whether to provide controlling or the greatest weight to Dr. McLaughlin's opinion that McGuire has marked and/or extreme limitations is without merit.

McGuire also asserts that the ALJ's discounting of Dr. McLaughlin's opinion on the basis that it was not consistent with his treatment notes was error.  However, substantial evidence supports the ALJ's determination that Dr. McLaughlin's treatment notes showing McGuire to be stable were not consistent with an opinion of marked limitations. Tr. 46.  For example, in August, 2007, McGuire indicated that, while she thought she could do better, she was doing OK, and her OCD symptoms were minimal.  Tr. 564-565.  At a July 18, 2008, visit, McGuire was calm and pleasant and, although she was stressed because her brother was now living with her (along with her three kids and husband), she reported being "never better," her family was supportive and her OCD symptoms again were minimal.  Tr. 744-745.  Also, at that same visit,

Dr. McLaughlin noted that McGuire's plan would not include a mental health therapist because McGuire was not interested.  Tr. 745.  Again, on December 31, 2008, although McLaughlin noted that McGuire was stressed lately and "down," she was calm and pleasant, her family was supportive, her OCD symptoms were minimal and she remained uninterested in seeing a mental health therapist.[15]  Tr. 748-749.

McGuire also challenges the ALJ's determination that a conservative course of treatment is inconsistent with an opinion that McGuire suffered from marked limitations.  Tr. 46. McGuire challenges this reasoning on the basis that the ALJ has substituted his lay opinion for that of Dr. McLaughlin's.  Doc. 19, p. 7.  The ALJ noted that, while Dr. McLaughlin saw McGuire "once every several months" and treated her with medication, McGuire did not attend counseling sessions.[16]  Tr. 46.  The ALJ was not indicating what treatment should have been provided to McGuire.  Rather, he was evaluating the mental health treatment that McGuire was receiving in relation to an opinion that McGuire suffered from marked limitations in her ability to: maintain concentration and attention for extended periods; sustain a routine without special supervision; perform activities within a schedule, maintain regular attendance and be punctual; and perform complex, repetitive, or varied tasks; and extreme limitations in her ability to: respond to customary work pressures; respond appropriately to changes in the work setting; and behave in an emotionally stable manner.  Tr. 882-883.  The ALJ's analysis in this regard is not

---

[15] The ALJ's determination that Dr. McLaughlin's marked limitation opinion was not supported by his treatment notes  is also supported by Dr. Mark Cohen's August 29, 2008, psychological evaluation performed in conjunction with preparing McGuire for a nerve stimulator study.  As part of that evaluation Cohen reviewed and considered Dr. McLaughlin's treatment notes.  Tr. 666.  Dr. Cohen indicated that Dr. McLaughlin's notes reflected that McGuire was stable on her medication and her mood was "never better," and that her psychiatric records showed only mild anxiety over the past year.  Tr. 666.  Further, McGuire reported to Dr. Cohen that depression was not a problem at that time, McGuire's mood was stable with medication and her energy level was good.  Tr. 667.

[16] McGuire argues that her lack of medical insurance to cover individualize psychotherapy cannot be held against her.  Doc. 19, p. 9.  There is no indication that the ALJ held her lack of medical insurance against her.  Furthermore, a review of the records cited by McGuire to support her argument that insurance would not cover such treatment shows that McGuire did "not believe her insurance would cover it," not that insurance in fact did not cover individual psychotherapy treatments.  Tr. 225, 538, 744, 845, 861.

unreasonable and is not an attempt to substitute his opinion as to what treatment should have been provided to McGuire for that of Dr. McLaughlin.  The foregoing demonstrates that the ALJ's decision not to provide controlling weight to Dr. McLaughlin's opinions is supported by substantial evidence and that the ALJ adhered to the treating physician rule.

### 2.  Dr. Stephens

Although a treating physician, Dr. Stephens had only been treating McGuire for approximately 5 months, i.e., since late July 2009, at the time she provided her opinion on January 6, 2010,.  Tr. 886.  The ALJ determined that Dr. Stephen's opinion that McGuire was limited to functioning at a sedentary level was not well supported or consistent with the weight of the evidence.   McGuire again asserts that the ALJ did not state the specific weight provided to Dr. Stephen's opinion.  However, the ALJ's decision and analysis of Dr. Stephen's opinion allows this Court to conduct a meaningful review and the ALJ provided good reasons for not providing controlling weight to Dr. Stephens' opinion.  *Rogers*, 486 F.3d at 242-243; *Nelson*, 195 Fed. App'x. 462.   The ALJ determined that McGuire's reported activities of daily living including being the primary caregiver for three young children, demonstrated that she was capable of performing activities at a less restrictive exertional level than sedentary as indicated by Dr. Stephens.  Tr. 45-46, 886.  In reaching his conclusion that the evidence supported a finding that McGuire could engage in light work, he took into account the fact that McGuire's husband and parents assist with heavy household chores and gardening.  Tr. 46.  Further, the ALJ considered other medical opinions of Dr. Huang and Dr. Goren, which also support a finding that McGuire had the capacity to perform activities at a light exertional level. Tr. 46.

The foregoing demonstrates that the ALJ's decision not to provide controlling weight  to Dr. Stephen's opinion that McGuire was limited to sedentary work was reasonable and is supported by substantial evidence.

### 3.  Dr. Halas

McGuire contends that the ALJ did not explicitly state the weight provided to the opinion of  consultative examining physician Dr. Halas.  Doc. 19, p. 10-11.  McGuire argues that Dr. Halas' opinion was consistent with Dr. McLaughlin's and therefore the lack of a clear explanation for the weight provided to Dr. Halas is particularly problematic.  Doc. 19, p. 10-11. However,  while there are some similarities between the two opinions, it is clear that Dr. McLaughlin's opinion contains a much greater range of limitations, and more severe limitations, than Dr. Halas' opinion.  Specifically, Dr. McLaughlin opined that McGuire had *marked* limitations in her ability to: maintain concentration and attention or extended periods; sustain a routine without special supervision; perform activities within a schedule, maintain regular attendance and be punctual;  and perform complex, repetitive, or varied tasks; and *extreme* limitations in her ability to:  respond to customary work pressures; respond appropriately to changes in the work setting; and behave in an emotionally stable manner.  Tr. 882-883.  In contrast, Dr. Halas only found marked limitations in one area.  Tr. 355.  As noted by the ALJ, Dr. Halas concluded that McGuire would be "markedly restricted in her ability to withstand the stress and pressure associated with a fast-paced or demanding work setting."  Tr. 46, 355. Although the ALJ did not specifically assign a weight to Dr. Halas' opinion, the RFC determined by the ALJ reflects the fact that he gave some weight to Halas's opinion that stress was a factor in determining McGuire's work limitations.  Specifically, the RFC provides that McGuire should be limited to low stress tasks and precluded from work involving arbitration, confrontation or

negotiation. Tr. 43-44.  Thus, since the ALJ's decision provides this Court with the ability to conduct a meaningful review, the lack of a specific assignment of weight is not a sufficient basis to overturn the Commissioner's decision.  *Rogers*, 486 F.3d at 242-243; *Nelson*, 195 Fed. App'x. 462.

**B.**   **The ALJ did not commit error by failing to explicitly mention the third party statements from McGuire's husband and mother.**

McGuire argues that the ALJ erred because he did not consider properly the third party statements of McGuire's mother Betty Reploge (Tr. 644-645) and McGuire's husband Kenneth McGuire (Tr. 597-599).  Doc. 19, p. 11-12.  McGuire argues that the third party statements demonstrate that McGuire received assistance from her mother and husband, which is contrary to the ALJ's portrayal of McGuire's activities of daily living.  Doc. 19, p. 12.  The ALJ's decision reflects the fact that he did consider information contained in the third party statements, i.e., he acknowledged and considered the fact that McGuire receives assistance from her parents and/or husband for heavier chores and in caring for her children at times.  Tr. 44, 46.  Thus, while the ALJ did not explicitly reference the third party statements, the ALJ did not ignore this lay evidence.  *See Allison v. Comm'r of Soc. Sec.*, 108 F.3d 1376, *3 (6th Cir. 1997).  Accordingly, this argument is without merit.

**C.**   **The ALJ properly assessed McGuire's credibility.**

McGuire asserts that the ALJ's credibility assessment consists of a single conclusory statement and therefore his credibility assessment is flawed and a basis for reversal.  Doc. 19, p.12-14.  The responsibility for determining a claimant's residual functional capacity rests with the ALJ.  20 C.F.R. § 404.1546(c).  It is the province of the ALJ, not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant, and such credibility findings are entitled to great deference. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007);

*Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  While it is true that a single conclusory statement that a claimant's allegations are or are not credible is insufficient, a review of the ALJ's decision demonstrates that the ALJ did consider a number of factors.  For example, when reaching his conclusion that "McGuire's impairments are not as disabling as alleged" (Tr. 47), he considered objective medical evidence (an x-ray in early 2006 that showed only mild disc disease, an x-ray following surgery in 2007 that showed vertebral bodies to be normal in height and alignment and no fracture or bony lesion identified, an MRI scan in 2008 that showed no evidence of nerve root impingement) (Tr. 45); McGuire's activities (caring for her children including an autistic child, performing light day-to-day activities) (Tr. 44, 46-47); location, duration, frequency and intensity of the symptoms (in February, 2008, McGuire complained of pain only when doing vigorous activities)(Tr. 45); and the lack of treatment other than medication (no mental health counseling sessions). Tr. 46.  *See* 20 C.F.R. § 404.1529(c) and Social Security Ruling 96-7p, 1996 SSR LEXIS 4 (July 2, 1996) (describing the kind of evidence to be considered when assessing credibility).  In light of the high degree of deference provided to an ALJ's credibility determination, the undersigned finds that the ALJ conducted a proper credibility determination and that said determination is supported by substantial evidence.  Accordingly, McGuire's last argument is also without merit.

## V.  Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends that the decision of the Commissioner be AFFIRMED.

Dated:  June  4, 2012

_____
Kathleen B. Burke
United States Magistrate Judge

23

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).